358 P.3d 632

Sara L. JAYNES, individually and on behalf of Seren A. Jaynes, a minor, and Isaac X. Ruiz, a minor, her children; Seren A. Jaynes, a minor, Isaac X. Ruiz, a minor, Plaintiffs/Appellants,

v.

Elizabeth J. McCONNELL, M.D.; Elizabeth J. McConnell, M.D. P.L.C., an Arizona professional limited liability company, Defendants/Appellees.

No. 1 CA–CV 13–0651.

Court of Appeals of Arizona, Division 1.

Sept. 15, 2015.

Timothy G. Kasparek, PLLC by Timothy G. Kasparek, Goodyear, Counsel for Plaintiffs/Appellants.

Jones, Skelton & Hochuli, P.L.C. by William R. Jones, Jr., Jonathan P. Barnes, Jr., Phoenix, Counsel for Defendants/Appellees.

Presiding Judge JOHN C. GEMMILL delivered the opinion of the Court, in which Presiding Judge KENTON D. JONES and Judge DONN KESSLER joined.

## OPINION

GEMMILL, Judge:

¶ 1 Sara Jaynes appeals the trial court's denial of her motion for new trial against Dr. Elizabeth McConnell and her employer (collectively "McConnell"). For the following reasons, we vacate the trial court's denial of Jaynes's motion and remand for a new trial.

## BACKGROUND

¶ 2 In April 2007, Jaynes was referred to colorectal surgeon Dr. Marc Goldblatt after a routine gynecological examination revealed a lesion on her rectovaginal wall. After examining the lesion, Goldblatt explained that the lesion was possibly a cyst and that removal was an option for treatment. Jaynes suffers from Ehlers–Danlos syndrome, a connective tissue disorder that complicates the healing process after injuries and surgical procedures. As a result, she was hesitant to have the lesion removed because of the risks involved. Goldblatt's office then scheduled an appointment for Jaynes to see McConnell, also a colorectal surgeon, for a more extensive transrectal ultrasound (TRUS).

¶ 3 Jaynes first saw McConnell on May 24, 2007. During that visit, McConnell performed a TRUS and found a 1.5 centimeter mass on the rectal wall. In her written report to Goldblatt, McConnell recommended a repeat measurement of the mass if it was not removed within three months. McConnell and Goldblatt also discussed the ultrasound results over the phone. Jaynes did not have the mass removed, and on September 13, 2007, she returned to McConnell's office for another TRUS. McConnell indicated, after the second TRUS, that the "cyst [was] relatively unchanged from last ultrasound," but expert testimony at trial indicated that the internal characteristics of the lesion had indeed changed between May and September. McConnell faxed her interpretation of the second TRUS to Goldblatt on September 14, 2007. McConnell did not call Goldblatt to discuss the results of this second ultrasound, and neither doctor scheduled or performed a follow-up visit with Jaynes after the second TRUS. Goldblatt states he spoke with McConnell in March 2008 to discuss the results of the second TRUS and the option of removal of the lesion. McConnell does not recall such a conversation with Goldblatt.

¶ 4 Three years later, in late 2010, Jaynes again sought medical help after experiencing additional symptoms related to the cyst. In January 2011, the cyst was diagnosed as neuroendocrine carcinoid Stage IV rectal cancer. This cancer is incurable and doctors predict that Jaynes will die from this disease.

¶ 5 Jaynes brought this malpractice lawsuit against Goldblatt and McConnell, claiming that they fell below the standard of care in their evaluation, treatment, and diagnosis of the cyst.[1] After an eight-day trial, the jury returned a verdict in favor of Jaynes. It awarded her $3.7 million in damages, allocating 25 percent fault to Jaynes and 75 percent fault to Goldblatt. The jury allocated zero percent fault to McConnell, and on January 22, 2013, the court filed a non-final, non-appealable judgment in favor of McConnell. On April 9, 2013, pursuant to a stipulation by the parties, the court filed a final order dismissing Goldblatt, the last remaining defendant in the case. Jaynes then filed a Rule 59 motion for new trial against McConnell, arguing that the trial court committed reversible error in excluding certain

---

1. Jaynes also joined Robert Newman and Associated Surgeons, PLLC. These defendants were al-located no fault, were dismissed after trial, and are not parties to this appeal.

expert testimony and that the verdict in favor of McConnell was not justified by the evidence. The trial court denied the motion as untimely and, alternatively, denied the motion on substantive grounds.

¶ 6 Jaynes timely appeals the trial court's denial of her new trial motion. This court has jurisdiction under Arizona Revised Statutes ("A.R.S.") § 12–120.21(A)(1) and –2101(A)(1).

## ANALYSIS

### I. Timeliness of Motion for New Trial

¶ 7 McConnell argues that because Jaynes's motion for new trial was not filed within 15 days of the court's entry of the January 22, 2013 non-final judgment in her favor, it was correctly denied by the trial court as untimely. Jaynes asserts that the time limit for filing a motion for new trial does not begin to run until a final, appealable judgment is entered, and therefore, the trial court erred when it denied her motion on that basis. Determining the timeliness of Jaynes's motion for new trial requires interpretation of certain rules of procedure, thereby presenting a question of law that we review de novo. See Felipe v. Theme Tech Corp., 235 Ariz. 520, 524, ¶ 10, 334 P.3d 210, 214 (App.2014); M–11 Ltd. P'ship v. Gommard, 235 Ariz. 166, 168, ¶ 6, 330 P.3d 356, 358 (App.2014). Because Arizona Rule of Civil Procedure 59 contemplates motions filed after entry of a final judgment, the trial court should not have denied Jaynes's motion as untimely.

¶ 8 Rule 59 imposes strict time limits for filing a motion for new trial that the trial court generally lacks jurisdiction to enlarge. Welch v. McClure, 123 Ariz. 161, 164–65, 598 P.2d 980, 983–84 (1979). Under the Arizona Rules of Civil Procedure, a motion for new trial is timely so long as it is filed "not later than 15 days after entry of the judgment." Ariz. R. Civ. P. 59(d). The Rules describe a judgment as an appealable

ruling: " 'Judgment' as used in these Rules includes a decree and an order from which an appeal lies." Ariz. R. Civ. P. 54(a). Therefore, the plain language of the rule supports the conclusion that Rule 59's time limit running from the "entry of the judgment" requires a final, appealable judgment before it is triggered.

¶ 9 This interpretation of Rule 59 is further supported by the principle underlying the rule's strict time limitations. The fifteen-day deadline imposed by the rule is meant to "preserve the finality of judgments." See Green v. Drug Enforcement Admin., 606 F.3d 1296, 1300 (11th Cir.2010). By definition, an interlocutory or non-final judgment can be modified by the court at any time before the judgment is entered. See Ariz. R. Civ. P. 54(b). Preserving the finality of judicial determinations is therefore not a concern when dealing with a non-final judgment. See 11 Charles Alan Wright et al., Federal Practice & Procedure § 2812 (3d ed.) (explaining that Rule 59 time limits are meant "to promote finality of judgments" and that this policy is "not applicable to an interlocutory order" because it "is not final and is subject to modification by the court at any time before judgment is entered"). This buttresses the conclusion that the time limit imposed by Rule 59 is not triggered by a non-final judgment but begins to run only upon entry of a final judgment.[2]

¶ 10 Additionally, our interpretation of Rule 59 is consistent with federal case law. Because Arizona's rules are substantially similar to the Federal Rules of Civil Procedure, we give significant weight to federal interpretations of those rules. Edwards v. Young, 107 Ariz. 283, 284, 486 P.2d 181, 182 (1971). At least six federal circuits have held that Rule 59 contemplates a final, rather than an interlocutory, judgment when imposing a time limit for filing a motion for new trial. See Auto Servs. Co., Inc. v. KPMG, LLP, 537 F.3d 853, 856–57 (8th Cir.2008)

2. We note, however, that Rule 59 does not require a party to wait until a final judgment has been entered to file a motion for new trial. A motion for new trial is timely any time after a verdict is rendered, up until fifteen days after the entry of a final judgment. See Dunahay v. Struz-

ik, 96 Ariz. 246, 393 P.2d 930 (1964) (determining that a motion for new trial filed after the verdict, but before the entry of judgment, was timely and proper); see also Farmers Ins. Co. v. Vagnozzi, 132 Ariz. 219, 221, 644 P.2d 1305, 1307 (1982).

(holding that a motion to reconsider under Rule 59 was timely filed after entry of final judgment and that a non-final judgment did not trigger the time limit); *Balla v. Idaho State Bd. of Corrections,* 869 F.2d 461, 466–67 (9th Cir.1989) (explaining that a final judgment as defined in Federal Rule of Civil Procedure 54(b) is a prerequisite for a Rule 59 motion for reconsideration); *Anderson v. Deere & Co.,* 852 F.2d 1244, 1246 (10th Cir. 1988) (holding that Rule 59's time limits do not begin to run until a final judgment is entered); *Bohack Corp. v. Iowa Beef Processors, Inc.,* 715 F.2d 703, 712 n. 10 (2d Cir.1983) (holding that a non-final judgment was not a judgment within the meaning of Rules 54(b) or 59); *O. Hommel Co. v. Ferro Corp.,* 659 F.2d 340, 353–54 (3d Cir.1981) (applying the First Circuit's holding that " 'judgment' in Rule 59(b) means final judgment"); *Warner v. Rossignol,* 513 F.2d 678, 684 n. 3 (1st Cir.1975) (declining to hold that the time limit for a new trial motion is triggered by an interlocutory ruling); *but see Tarlton v. Exxon,* 688 F.2d 973, 978–79 (5th Cir.1982) (rejecting the argument that "judgment" in Rule 59 refers to a final or appealable judgment).

¶ 11 McConnell points to *In re Estate of Hanscome,* 227 Ariz. 158, 254 P.3d 397 (App. 2011), as authority for her position that a final judgment is not required to start Rule 59's 15–day time limit. In that case, the trial court awarded an additur in favor of a litigant, despite the fact that the litigant did not file a Rule 59 motion for new trial. *Id.* at 163, 254 P.3d at 402. Nonetheless, the litigant argued that because the opposing party filed a timely Rule 59 motion, the trial court could grant a new trial in favor of the non-moving party under Rule 59(g).[3] *Id.* at 164, ¶ 19, 254 P.3d at 403. This court held that although Rule 59(g) gives the trial court discretion to grant a new trial motion for reasons not articulated by the movant, it does not allow a reviewing court to grant relief under Rule 59 to a non-moving party. *Id.* at

¶ 20. *Hanscome* did not involve a Rule 59 motion filed after a non-final ruling, but instead involved a litigant who failed altogether to file a motion for new trial. *Id.* Moreover, the Rule 59 motion filed by the other litigant followed a final judgment by the trial court. *Id.* at 160, ¶¶ 3–4, 254 P.3d at 399. *Hanscome* is therefore inapplicable here.

¶ 12 The parties here agree that the court's judgment in favor of McConnell, entered on January 22, 2013, was not a final judgment as defined by Rule 54. The judgment did not dismiss all claims or defendants involved in the case and did not contain a certification of finality pursuant to Rule 54(b). *See Maria v. Najera,* 222 Ariz. 306, 307, ¶ 7, 214 P.3d 394, 395 (App.2009) (holding that a judgment leaving two of five claims undecided and lacking Rule 54(b) certification was merely interlocutory, rather than final); *see also Stevens v. Mehagian's Home Furnishings, Inc.,* 90 Ariz. 42, 44–45, 365 P.2d 208 (1961) (explaining that an action involving multiple claims or defendants is treated as one judicial unit, and until the court has disposed of all claims against all parties, the judgment is not final). Because it was not a final judgment, the time to file a motion for new trial under Rule 59 did not begin to run upon entry of the ruling. Instead, the time limit was triggered on April 9, 2013, when Goldblatt was formally dismissed from the case and the judgment in favor of McConnell became final as a result. Jaynes's April 23 motion for new trial was therefore timely filed within the 15–day limit imposed by Rule 59(d). The trial court erred in denying this motion as untimely.

## II. Exclusion of Personal Practices Testimony

¶ 13 The superior court also denied Jaynes's new trial motion on the merits, holding there was no error in excluding personal practices testimony from McConnell's expert witness. "We apply an abuse of discretion standard when reviewing the denial

---

3. Arizona Rule of Civil Procedure 59(g) states:
Not later than 15 days after entry of judgment the court of its own initiative may order a new trial for any reason for which it might have granted a new trial on motion of a party. After giving the parties notice and an opportunity to be heard on the matter, the court may grant a motion for a new trial, timely served, for a reason not stated in the motion. In either case, the court shall specify in the order the grounds therefor.

of a motion for new trial." *Health For Life Brands, Inc. v. Powley*, 203 Ariz. 536, 542, ¶ 28, 57 P.3d 726, 732 (App.2002). After the second TRUS, McConnell faxed her interpretation of the results to Goldblatt's office. Although McConnell's interpretation of the second TRUS noted that the mass was relatively unchanged, expert testimony at trial interpreted the second TRUS to show that the character of the lesion in September was noticeably different from the character of the lesion in May. McConnell and Goldblatt did not discuss the results of the second TRUS until at least March 2008—as recalled by Goldblatt—almost six months after the ultrasound was performed. At trial, Jaynes argued that the standard of care required McConnell to make a prompt follow-up phone call to Goldblatt, which she did not do.

¶ 14 Jaynes challenges the trial court's ruling sustaining an objection to certain testimony from Dr. Robert Campbell and denying her motion for new trial on that basis. Campbell was the expert hired by McConnell to testify as to the applicable standard of care. He had testified in deposition that it was his personal practice to follow up with a referring physician after observing significant changes in an ultrasound:

> I personally would call the doctor if my interpretation of the ultrasound was one, that the lesion had changed significantly, I would have called the referring doctor. I wouldn't make a treatment recommendation on the report. I would call the referring doc and say, hey, the lesion is the same size but it looks funny on the inside; it looks different. What are you going to do about it?

At trial, Jaynes asked Campbell whether the standard of care required McConnell to call Goldblatt following a second TRUS and then asked Campbell about his personal practice under similar circumstances:

> [COUNSEL FOR JAYNES]: Does standard of care require a colorectal surgeon, who is interpreting an ultrasound in a complex case, to pick up the phone after sending the report and—and talk to the referring colorectal surgeon to discuss the fact that it is complex and that the report may not have all the information in it?

[COUNSEL FOR McCONNELL]: Objection. Assumes facts not in evidence.

THE COURT: Overruled.

[DR. CAMPBELL]: The standard of care does not require a phone call.

[COUNSEL FOR JAYNES]: That's not what I asked you, sir. I didn't ask you if the standard of care required a phone call in all cases. I asked you specifically in a complex case such as this—you have already agreed that this was a complex case—did the standard of care require Dr. McConnell to pick up the phone after sending the September 13, 2007 report, and discuss the case with Dr. Goldblatt?

[DR. CAMPBELL]: No.

[COUNSEL FOR McCONNELL]: Objection.

THE COURT: It would have been overruled anyway.

[COUNSEL FOR JAYNES]: That's different than your personal practice, isn't it?

[DR. CAMPBELL]: Yes.

[COUNSEL FOR McCONNELL]: Objection to relevancy.

THE COURT: Sustained. The jury will disregard the last question. Ladies and gentlemen, the issue of this case is not what individual doctors may or may not do; it's what the standard of care is for physicians in this state.

¶ 15 Jaynes argues that evidence of Campbell's personal practices was relevant for the jury to determine the applicable standard of care and evaluate Campbell's credibility. We review a trial court's evidentiary rulings for abuse of discretion. *Pipher v. Loo*, 221 Ariz. 399, 401, ¶ 6, 212 P.3d 91, 93 (App.2009). We will not disturb a trial court's evidentiary ruling unless it is an abuse of discretion and prejudice results. *Gemstar Ltd. v. Ernst & Young*, 185 Ariz. 493, 506, 917 P.2d 222, 235 (1996).

¶ 16 This court addressed the admissibility of personal practice testimony in *Smethers v. Campion*, 210 Ariz. 167, 108 P.3d 946 (App. 2005). In that case, a laser eye surgeon was sued for malpractice when he failed to remeasure his patient's eyes prior to laser vision surgery. *Id.* at 169, ¶ 5, 108 P.3d at 948.

The patient, who wore contact lenses, was advised to remove them for several days prior to surgery, presumptively changing the shape of his eye from the measurement performed during his surgical consultation. *Id.* Because the measurements relied upon were incorrect, the vision surgery was ineffective and the patient's vision became worse. *Id.* at ¶ 6.

¶ 17 The defendant retained another laser eye surgeon to testify as a standard of care expert. *Id.* at 170, ¶ 9, 108 P.3d at 949. In his deposition, the expert stated that it was his personal practice to re-measure his patient's eyes prior to performing laser vision surgery even though, in his view, the standard of care did not require the measurement. *Id.* Prior to trial, the court granted a motion *in limine* preventing the patient from questioning the expert as to his personal practice, stating that such testimony was not relevant to the jury's determination of the standard of care. *Id.* at 173, ¶ 22, 108 P.3d at 952.

¶ 18 This court disagreed and held that an expert's testimony as to his or her personal practices may be relevant because such evidence is helpful to the jury for determining the applicable standard of care. *Id.* at 177, ¶ 32, 108 P.3d at 956. "[H]ow a testifying expert approaches a medical problem may be relevant and of assistance to the jury in determining what the standard of care requires in a similar circumstance." *Id.* This court also noted that such evidence is crucial to allow the jury to "fully evaluate the credibility of the testifying expert." *Id.* It explained that "the fact that an expert testifies that the standard of care does not require what that expert personally does in a similar situation may be a critical piece of information for the jury's consideration." *Id.* As a result, the trial court's exclusion of the expert's personal ophthalmological practice was error. Further, the error was not merely harmless because there was no way to "pre-

dict how a jury would have reacted to" knowledge of the expert's personal practices. *Id.* at ¶ 34. Accordingly, this court reversed the verdict and remanded the case for a new trial. *Id.*

¶ 19 The logic of *Smethers* applies here. Jaynes attempted to introduce evidence that, in circumstances similar to this case, Campbell's personal practice is to call a referring physician after interpreting a follow-up ultrasound. This personal practice of Campbell went above and beyond the minimum standard of care he described in his testimony. This evidence was relevant to assist the jury in its factually intensive determination of the relevant standard of care. Moreover, it also pertained to Campbell's credibility as an expert witness by suggesting that his personal practices differ from the standard of care he espoused. Exclusion of such evidence was, therefore, error.[4]

¶ 20 McConnell further asserts that even if erroneous, the court's exclusion of her expert's personal practices testimony was harmless. The Rules of Civil Procedure provide that an error is harmless unless it is inconsistent with substantial justice or affects the substantial rights of the parties. Ariz. R. Civ. P. 61. We cannot say that this error had no effect on Jaynes's substantial rights. Determination of the standard of care is highly fact-driven, and juries are entitled to consider all evidence in order to fully evaluate an expert's credibility. *Smethers* at 177, ¶ 32, 108 P.3d at 957. Despite McConnell's interpretation to the contrary, both experts testified that the nature of Jaynes's lesion changed between her first and second ultrasounds. Jaynes's expert testified that when such a change is observed, it is crucial that the doctor interpreting the ultrasound communicate her findings to the referring physician with more than just a written report. We cannot predict how the jury would have reacted to the knowledge that Campbell's own personal practice in a similar case is to

---

**4.** McConnell also argues that Jaynes waived her personal practices testimony argument because she failed to make an offer of proof at trial. Although Jaynes did not make a formal offer of proof, an offer of proof is not necessary in cases where the "trial court [can] judge the type of testimony to be elicited." *Horan v. Indus.*

*Comm'n,* 167 Ariz. 322, 325, 806 P.2d 911, 914 (App.1991) (quoting *State v. Kaiser,* 109 Ariz. 244, 247, 508 P.2d 74, 77 (1973)). Based on the line of questioning posed to Campbell at trial, the specific question about his personal practice, and his answer prior to the objection, a formal offer of proof was not necessary.

call the referring physician. Accordingly, the exclusion of Campbell's personal practices testimony was not harmless.

¶ 21 To avoid this conclusion, McConnell further argues the jury could have concluded that her failure to discuss the report with Goldblatt did not proximately cause any harm. McConnell points to evidence that Goldblatt was the treating physician, he always thought the mass should be removed, and he did not look to McConnell for advice on the details of Jaynes's treatment plan.

¶ 22 Determination of proximate cause is generally a question of fact for the jury to decide. *See Smith v. Chapman,* 115 Ariz. 211, 214, 564 P.2d 900, 903 (1977); *see also Diaz v. Phoenix Lubrication Serv., Inc.,* 224 Ariz. 335, 338, ¶ 12, 230 P.3d 718, 721 (App.2010). A reasonable jury, armed with all the admissible evidence, could find that McConnell contributed to Jaynes's injuries if she did not accurately report the results of the second TRUS and did not call Goldblatt to discuss those results, assuming the jury decided that the standard of care required such a call. The erroneously excluded evidence was probative not only regarding the standard of care and potential breach thereof, but also regarding proximate causation. Goldblatt testified that after reading the second ultrasound report, he still did not think the mass was life-threatening. Had McConnell made a follow-up phone call and accurately explained the results of the second TRUS, Goldblatt may have changed his conclusion and his subsequent advice to Jaynes, causing him to place more emphasis on the importance of having the lesion removed. Goldblatt may even have insisted that Jaynes have the mass excised promptly. Accordingly, a jury could have found that McConnell's failure to call Goldblatt after the second ultrasound was a proximate cause of some harm to Jaynes. Therefore, we cannot hold that exclusion of testimony regarding the advisability of such a phone call was harmless error.

### CONCLUSION

¶ 23 The exclusion of Campbell's testimony about his personal practice deprived the jury of important evidence to determine both Campbell's credibility and the applicable standard of care. Because we cannot predict how the jury would have assessed this excluded testimony and its effect on Goldblatt's future conduct in treating Jaynes, the error was not harmless.

¶ 24 We therefore reverse the court's denial of Jaynes's Rule 59 motion and remand for a new trial against McConnell.